UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARKITA S. JOHNSON,<br>    *Plaintiff*, | )<br>)<br>) | |
| *vs.* | ) | 1:08-cv-01600-JMS-LJM |
| MICHAEL J. ASTRUE, Commissioner of the<br>Social Security Administration,<br>    *Defendant*. | )<br>)<br>)<br>) | |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

At about age six, Plaintiff Markita S. Johnson began receiving Supplemental Social Security Income ("SSI") disability benefits (for which disabling condition, the parties don't say). [R. 15.][1]  Because of a change in the law, the Commissioner reviewed her disability status in 1999 and found her no longer disabled. [R. 836-37.] Ms. Johnson never appealed that decision to federal court. She did, however, file a new SSI childhood disability application in 2000, based upon claims of mental retardation. [R. 15.] The Commissioner granted that application. [*Id.*] But once she turned eighteen, the Commissioner had to reevaluate it, to decide whether she remained disabled as an adult. Finding that she didn't, the Commissioner discontinued her benefits. He also denied two other applications for adult Disability Insurance Benefits ("DIB") that she filed, one filed in 2005 based upon her mother's earnings record and the other filed in 2007 based upon her own earnings. [*Id.*][2]

---

[1] Upon the written consent of the parties, this matter has been assigned to the magistrate judge for all proceedings, including for the entry of judgment, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [Dkt. 32.]

[2] Although the two programs have differences, they share the same definition of "disabled." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). Therefore, when the Court discusses Ms. Johnson's claims of disability, the discussion applies equally to that required under each program.

Ms. Johnson now asks the Court to review the Commissioner's decision to discontinue her benefits at eighteen and his denial of her 2005 and 2007 applications. All three applications at issue were the subject of a hearing before an Administrative Law Judge ("ALJ") in April 2008, a hearing which forms the focus of the present proceedings.

## BACKGROUND

During her childhood, Ms. Johnson was diagnosed at various times either as mildly or as moderately mentally retarded. For example, Ms. Johnson had to repeat kindergarten, and, in connection with IQ testing at the time (1993), a school psychologist noted that her "[c]ognitive and language development appear[ed] to be significantly delayed." [R. 710-11.] The psychologist determined her IQ to be 65, "at the upper end of the mildly mentally handicapped range." [R. 709, 710.] Accordingly, Ms. Johnson's mother agreed to place her in special education classes, which she would continue throughout school (except for math). [R. 695, 699.] Four years later, for SSI disability purposes, Dr. Dobbs, a psychologist, tested Ms. Johnson and found her IQ to be 45. [R. 741.] He noted that she "had an odd presentation that appeared alternately that she had been coached to fake bad or that she may have an underlying thought disorder in addition to her low IQ." [R. 744.] But he accepted the latter possibility, expecting that some unspecified thought disorder would emerge as Ms. Johnson grew older. [*Id.*] His report did, however, note that Ms. Johnson claimed to have imaginary friends. [R. 740.]

Yet the record also indicates greater intellectual aptitude for Ms. Johnson as a child. Just a few months before Dr. Dobbs' IQ testing, Ms. Johnson received IQ testing from a school

psychologist. [R. 666.] Ms. Johnson scored a 77. [*Id.*][3] Ms. Johnson's fifth-grade teacher also noted that Ms. Johnson "is much more able than she lets on." [R. 765.]

As an adult, for the purposes of her adult disability claims, Ms. Johnson underwent IQ testing in March 2005, with Dr. Henry. She again claimed to hear voices that said "Hi" to her. [R. 286.] He couldn't obtain a valid IQ score for her because she scored a "zero" on several performance tests (which resulted in an invalid IQ of 47), though he did note that she put forth a good effort. [R. 288, 289.] Two years later, Dr. Modlik, who examined her for the Commissioner, disagreed. Based on his experience, and given both the rarity of zero scores and other testing that he performed, Ms. Johnson malingered in her IQ testing with Dr. Henry. [R. 380.] Her malingering likewise forced Dr. Modlik to stop his own IQ testing. [R. 381.] Further, he explained that her volunteered claims of having imaginary friends or seeing witches also represented malingering, which she "immediately dropped" once he "indicated to her that [such a claim] was not going to get her disability monies." [R. 380.]

All told, the record reveals the following IQ scores for Ms. Johnson:

| Date | IQ (Full-Scale) | Notes |
|---|---|---|
| October 1993 | 65 | [R. 708.] |
| April 1997 | 77 | No thought disorder reported. [R. 667.] |
| June 1997 | 45 | Malingering discounted because of possible presence of latent thought disorder. [R. 741.] |
| April 2000 | 56 | She put forth a "good effort." No thought disorder reported. [R. 338, 340.] |
| September 2002 | 56 | [R. 208.] |
| March 2005 | 45 | Invalid score per Dr. Henry. [R. 288.] |
| October 2007 | n/a | Test stopped because of malingering. [R. 380.] |

---

[3] When comparing IQ scores, it is important to note that "IQ scores are not absolute tests of acuity; a person with an IQ of 70 cannot be said to be half as smart as a person with an IQ of 140. Intelligence is, in effect, graded on a curve. Roughly 95 percent of the population has an IQ between 70 and 130…." *Mendez v. Barnhart*, 439 F.3d 360, 361 (7th Cir. 2006).

Whatever her IQ, Ms. Johnson now lives in her own apartment. [R. 510.] At least at the time of her hearing before the ALJ, she worked part-time as a stocker at a Dollar Tree store (four days per week, three-to-four hours per day), walking approximately 1.5 miles to work. [*Id.*; R. 379.] Previously, from 2003 to 2005, she worked nearly fulltime (thirty-five hours per week) at Subway, making sandwiches, but quit without providing a reason. [R. 161.] She had also worked as a housekeeper at a hotel, a job from which she originally claimed to have been "fired" for being "too slow," [R. 411], but later conceded to the ALJ that she had abandoned the position (because it involved too much reaching). [R. 26, 515-16.]

Beginning in February 2006—at her attorney's suggestion, [R. 424]—Ms. Johnson presented for treatment at Gallahue Mental Heal Services. According to the assessment form, she did so because she was "about to be dropped from Medicaid and Disability status," and was experiencing a variety of mental health issues, including biting her nails to the quick, hallucinations, delusions, anxiety, and depression. [R. 413-14.] She received therapy and Lexapro, and, by May 2007, her mother "report[ed] improved mood, [decreased] irritability, and less withdrawn." [R. 451.] By September 2007, Ms. Johnson reported "no anxiety or significant depressed mood" and increased motivation. [R. 457.]

In connection with her upcoming hearing before the ALJ, Ms. Johnson's treating psychiatrist, Dr. Anderson, submitted a "Mental Residual Functional Capacity Assessment." [R. 464-66.] He diagnosed her with mild mental retardation, major depressive disorder, social anxiety disorder, and "PPD" (an undefined diagnosis in the record). [R. 464.] In all but two of twenty areas of functioning, for which she had only moderate limitations, he concluded that she had marked limitations. [R. 465-66.]

Dr. Anderson's findings were significantly more restrictive than those of the state reviewing psychologists, Drs. Gange and Shipley, who found her only markedly limited in two areas: her ability to understand and remember detailed instructions and her ability to carry out detailed instructions. [R. 248, 280.] Both concluded that she could still perform "simple, repetitive work tasks." [R. 250, 282.] Dr. Modlik, who examined Ms. Johnson in October 2007, concurred that Ms. Johnson has "some capacity for employment," and only has marked limitations in understanding and remembering complex instructions, carrying them out, and making complex work-related decisions. [R. 386.]

After reviewing the evidence, the ALJ determined that Ms. Johnson has borderline intellectual functioning. [R. 18.] Even when limiting her to merely routine and repetitive work, no unusually high time or production quotas, and minimal reading and writing, the ALJ found that jobs exist that Ms. Johnson has the capability to perform. Among them are maids, hand packagers, and assemblers. [R. 27.]

## DISCUSSION

This Court's role in this action is limited to ensuring that "the ALJ applied the correct legal standard, and [that] substantial evidence supports the decision." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purposes of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), the Court must afford the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted). If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. Otherwise the Court

must generally remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits.  *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

> To evaluate a disability claim, an ALJ must use the following five-step inquiry:
>
> (1) [is] the claimant … currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment … one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, …can she perform her] past relevant work, and (5) is the claimant … capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted).

Ms. Johnson contends that the ALJ committed three broad errors.  At a global level, she contends that the ALJ improperly judged her credibility.  She additionally assigns error at Steps Three and Five.

### A.  Credibility Determination

Ms. Johnson says that the ALJ committed two errors in assessing her credibility, neither of which the Court finds persuasive.

First, Ms. Johnson argues that the ALJ "misstated" the evidence about her past success at holding down employment and about her reliance on her mother for the needs of day-to-day living, given certain evidence in the record to the contrary.  [Dkt. 21 at 31-32.][4]  For the most part, the ALJ discussed all that evidence in his opinion, and did so accurately.  [*See* R. 20 (outlining Ms. Johnson's employment history and generally summarizing the help that Ms. Johnson receives from her aunt and from her mother)].  Thus, the ALJ didn't "misstate" it.  *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (requiring a remand in part because of

---

[4] Ms. Johnson doesn't challenge the ALJ's finding that Ms. Johnson's claims of imaginary friends "are clearly a fabrication to enhance her disability case." [R. 26.]

- 6 -

selective discussion of some evidence and inaccurate description of other). To the extent, however, that Ms. Johnson really contends that the ALJ was required to not only believe it but to conclude from it that she is as disabled as she claims, the Court disagrees. The standard of review is too narrow for the Court to second-guess, for example, the weight that the ALJ afforded to Ms. Johnson's two years of nearly full-time work at Subway with "[n]o problems" despite her claims of complete disability. [*See* R. 21.] As for the one piece of evidence that the ALJ failed to mention—a potential qualifier to his statement that that Ms. Johnson "sometimes takes a bus," [R. 20], but only does so when her mother tells her which one to take, [dkt. 21 at 32 (citing R. 521)]—the failure constitutes at most harmless error, *see Keys v. Barnhart*, 347 F.3d 990, 995 (7th Cir. 2003) (explaining that harmless-error analysis applies in the Social Security context). Given everything else in the record, that piece of the evidence, even if accepted, wouldn't have changed the ALJ's assessment that Ms. Johnson "is much more functional than she maintains." [R. 26.]

Second, if the substance of the ALJ's credibility determination doesn't qualify for remand, Ms. Johnson contends that the form does. She says that the ALJ failed to follow the analytical framework that the SSA has developed for credibility determinations and published as SSR 96-7p. That framework directs ALJs to consider a variety of factors before discounting a claimant's credibility including, for example, "the individual's daily activities." SSR 96-7p. Because Ms. Johnson doesn't specify which of those factors the ALJ allegedly failed to consider, much less develop that claim with evidence, Ms. Johnson has waived her claim in that regard, a claim which, in any event, the Court's own review of the ALJ's opinion finds to be meritless. *See Lachman v. Ill. State Bd. of Ed.*, 852 F.2d 290, 291 n.1 (7th Cir. 1988) (noting that "an issue expressly presented for resolution is waived if not developed by argument" (citation omitted)).

In short, the Court finds no error regarding the ALJ's assessment of Ms. Johnson's credibility.

### B.  Step Three

At Step Three, the ALJ must consider whether a disability applicant has one or more conditions that the Social Security Administration considers conclusively disabling. Those conditions, so-called "Listed Impairments," are set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. Even if a disability application does not satisfy the requirements of a particular listing, the applicant will still be considered disabled if the applicant can demonstrate "medical equivalence"—in other words, that the applicant has symptoms at least as serious as, and has had them for at least as long as, the criteria set forth in the Listed Impairments. *See* 20 C.F.R. § 404.1525(c)(5) ("If your impairment(s) does not meet the criteria of a listing, it can medically equal the criteria of a listing."); *id.* § 404.1526 (setting forth standards for determining medical equivalence). Ms. Johnson assigns three errors at this Step.

#### 1.  The ALJ's Failure to Discuss Certain Listed Impairments

When an ALJ fails to discuss a Listed Impairment "by name" that is potentially supported by the evidentiary record and offers a merely "perfunctory analysis" of its potential applicability, the Seventh Circuit directs trial courts to remand disability denials back to the Commissioner. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).[5] Ms. Johnson invokes that rule here. Her prehearing brief to the ALJ specifically contended that her degree of mental retardation met or equaled Listed Impairment 12.05(B) and/or (C) [R. 491.][6] Furthermore, she says, although she didn't raise them in her prehearing brief, the ALJ also should have known to discuss Listed

---

[5] The analysis can appear anywhere in the ALJ's opinion, even though it is not included under the Step Three heading. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

[6] The pre-hearing brief also alleged that Ms. Johnson met or equaled Listed Impairment 112.05(B) and (C) (both for mental retardation). [R. 491.] She makes no such claim here.

Impairments 12.05(D) (also for mental retardation),[7] 12.03 (schizophrenia), 12.04 (major depressive disorder), and 12.06 (anxiety disorder), given the evidence in the record. [Dkt. 21 at 21.][8] Yet his opinion only specifically discusses Listed Impairment 12.02 (organic mental disorders), a Listed Impairment that she has never contended applies to her. [*See* dkt. 28 at 3.][9]

### a. Listed Impairment 12.05(B) Through (D).

To meet or equal Listed Impairment 12.05(B) through (D), for mental retardation, Ms. Johnson concedes that, at a minimum, she had to present evidence of a valid IQ score below 70. [*See* dkt. 28 at 5-6 (arguing that she either met or equaled each subsection because her IQ is below 70).] At the hearing, however, the ALJ didn't have a valid current IQ score for Ms. Johnson. As a child, her IQ scores ranged between 45 to 77. [R. 708, 741.] But because IQ scores often fluctuate in children under sixteen, those scores were legally stale by the time of Ms. Johnson's hearing. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10) ("IQ test results obtained between ages 7 and 16 should be considered current for…2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for…1 year if at 40 or above.").

---

[7] Ms. Johnson doesn't argue that she meets or equals Listed Impairment 12.05(A) for mental retardation, which among other things requires "[m]ental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(A). [*See* dkt. 28 at 5-6.]

[8] In her opening brief, Ms. Johnson alternates between arguing that the ALJ should have discussed Listed Impairment 12.04 and 112.04. [*Compare* dkt. 21 at 21, 23, *with* dkt. 28 at 3.] Both Listed Impairments relate to mood disorders, with the former used for adults and the latter used for children. Ms. Johnson's reply brief makes no further citation to Listed Impairment 112.04, so the Court won't discuss it, assuming the previous citation to have been in error.

[9] The ALJ's discussion of Listed Impairment 12.02 wasn't completely random. That Listed Impairment involves mental disorders associated with, among other things, memory impairment, hallucinations, mood disturbances, and/or IQ loss. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02. Furthermore, the "B" criteria of that Listed Impairment are the same as the "B" criteria of Listed Impairments 12.03 and 12.04, and 12.06, and the same as the "D" criteria of Listed Impairment 12.05. The ALJ found that those criteria were not present.

The two attempts at determining Ms. Johnson's IQ as an adult also failed to produce valid scores. Dr. Henry determined that Ms. Johnson's "zero" scores on several portions of the IQ test he administered rendered his tentative IQ calculation of 45 "invalid." [R. 299.] Given the rarity of zero scores, Dr. Modlik would later describe the source of that invalidity as malingering—in other words, that Ms. Johnson intentionally missed items to try and obtain a low IQ score. [R. 380.] Dr. Modlik's own attempt to obtain a valid IQ score was again thwarted by what he perceived as Ms. Johnson's malingering on the IQ testing, so he stopped mid-way through the exam and never computed an IQ. [R. 381.]

Ms. Johnson challenges the ALJ's decision to accept Dr. Modlik's opinion of malingering; however, the Court finds no error. Insofar as Ms. Johnson describes Dr. Modlik as "notorious" for finding "every" disability claimant malingering, [dkt. 28 at 7], she has cited to no evidence in the record to support such a charge.[10] Thus, the Court cannot credit it. *See United States v. Phillips*, 914 F.2d 835, 840 (7th Cir. 1990) ("An appellant may not attempt to build a new record on appeal to support his position with evidence that was never admitted in the court below." (citation omitted)); *Box v. A&P Tea Co.*, 772 F.2d 1372, 1379 n.5 (7th Cir. 1985) ("[A]rguments in briefs are not evidence."). Insofar as she points to her zigzagging childhood IQ scores as evidence that she wasn't malingering as an adult—she argues that children don't malinger as a general rule and, in one instance yielding an IQ of 45, the test administrator explicitly ruled out malingering, [R.744]—that evidence is simply not powerful enough to preclude the ALJ from relying upon Dr. Modlik's lengthy, reasoned discussion about why he believed that Ms. Johnson malingered on her adult IQ tests.

---

[10] The Court notes that Ms. Johnson's attorney never asked Ms. Johnson to deny under oath Dr. Modlik's charges of malingering.

Because Ms. Johnson didn't have a valid adult IQ score, the ALJ decided to accept the highest of Ms. Johnson's childhood IQ scores, a 77, figuring Ms. Johnson couldn't "fake high" on an IQ test (a rationale not challenged here). [R. 25.] That approximation of Ms. Johnson's current IQ was consistent with Dr. Modlik's opinion. [R. 382 (indicating that her behavior during the examination "certainly appears consistent with borderline intellectual functioning").] And it was one too high for Ms. Johnson to potentially qualify for Listed Impairment 12.05(B) through (D), meaning that the ALJ's omission of that Listed Impairment cannot constitute reversible error.

### b. Listed Impairments 12.03, 12.04, and 12.06

Despite complaining in her opening brief that the ALJ didn't *sua sponte* address Listed Impairments 12.03, 12.04, and 12.06, Ms. Johnson's reply largely leaves unanswered the Commissioner's lengthy discussion of why the evidence doesn't support a finding of disability under those Listed Impairments. The only thing Ms. Johnson does in reply is to incorporate by reference the evidence she cited in her original brief, which she says establishes that she meets or equals the Listed Impairments. But her opening brief offered only a string of block quotes from medical records for those items, devoid of any legal analysis. [*See* dkt. 21 at 22-27.] As this Court as noted before, such a briefing stratagem doesn't constitute cogent argument and results in the waiver of argument. *See, e.g.*, *Reese v. Astrue*, 2009 WL 499601, *5 (S.D. Ind. 2009) ("[A] bare listing of evidence not specifically addressed by the ALJ fails to present an issue on review."). The Court reiterates that maxim and applies it here.

### 2. The ALJ's Failure to Summon a Medical Expert

Ms. Johnson next contends that the ALJ needed to summon a medical expert to the hearing to opine about whether Ms. Johnson equaled any Listed Impairments; without one, she says, the ALJ was impermissibly left to "play doctor" and simply speculate that she didn't equal

any Listed Impairment.  *See* SSR 96-6p ("Longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."); *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) (remanding where the ALJ "played doctor" rather than summon a medical expert).

As the Commissioner points out, however, he asked Drs. Shipley and Gange to opine in 2005 about whether Ms. Johnson met or equaled any Listed Impairments.  [*See* R. 252-279.] They said no.  [*Id.*][11]

Although Ms. Johnson argues that their opinions weren't sufficient, the Court disagrees. First, the fact that their opinions predated the hearing by two years is of no consequence.  An ALJ need only summon a medical expert when the ALJ receives "additional medical evidence…that in the opinion of the administrative law judge…may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  SSR 96-6p.  Other than a note from Ms. Johnson's high school confirming that she received special education services dated August 2005, [R. 238], and Dr. Anderson's August 2007 RFC assessment, [R. 465], Ms. Johnson points to no evidence that triggered the ALJ's duty to summon a medical expert.  As to the former, Ms. Johnson's special-education status was never in dispute, and was disclosed to the Commissioner (among other places) in her disability application, [R. 193].  As to the latter, the ALJ explained that he rejected Dr. Anderson's conclusions because they lacked sufficient foundation and conflicted with Dr. Modlik's evaluation.

---

[11] They did, however, believe that she had mild retardation rather than the borderline-intelligence that the ALJ ultimately found.  [R. 22.]

Second, Ms. Johnson offers absolutely no evidence to support her charge that Drs. Shipley and Gange didn't have Dr. Henry's March 2005 report where he concluded that Ms. Johnson had an "unspecified" degree of mental retardation (owing to what Dr. Modlik would later determine to be malingering.) [R.299.] Particularly given that Ms. Johnson waited to her reply brief to assert that charge, thereby denying the Commissioner the opportunity to address it, the Court must charge that failure of evidence to her.[12]

Third, Ms. Johnson's complaint that she wasn't able to cross-examine Drs. Shipley and Gange at her hearing also falls short. The ALJ advised Ms. Johnson that she had the right to request that he issue subpoenas to witnesses. [R. 31.] The record reveals no request for subpoenas to those individuals, much less a denial of such a request.

Accordingly, the Court finds no error in the ALJ's failure to summon a medical expert to testify at the hearing.

### 3.  The Lack of Controlling Weight for Treating Medical Opinions

Ms. Johnson next contends that the ALJ failed to follow the Social Security Administration's formal analytical framework for evaluating the weight to attach to the opinions of treating medical sources, a framework codified at 20 C.F.R. § 404.1527(d)(2). Under it, the ALJ must generally attach "controlling weight" to such opinions, absent "good reasons," which are delineated in the regulations. *Id.*

In his response brief, the Commissioner tried to pin Ms. Johnson down as to which treating medical opinions that the ALJ supposedly failed to afford the appropriate weight—from the "fourteen years of special education and psychiatric treatment evidence" that Ms. Johnson said were at issue, [dkt. 21 at 29-30]. But in reply, Ms. Johnson refused. She reiterated her

---

[12] Indeed, Ms. Johnson withheld all her arguments about Drs. Shipley's and Gange's opinions until her reply brief.

contention that the ALJ improperly rejected "every item of evidence cited in plaintiff's [opening] Brief." [Dkt. 28 at 10.]

Like the Commissioner, the Court finds inappropriate Ms. Johnson's *al dente* style of argumentation—throw a mass of evidence to the wall and see if anything sticks. *Cf. Smith v. Eaton*, 910 F.2d 1469, 1471 (7th Cir. 1990) ("We see no functional difference between a brief containing a mere passing reference to a legal argument and one with a shallow, incoherent 'argument' that spans twenty-five pages…. In both instances, the court is frustrated in performing its function of review and evaluation of the judgment before it."). Without argument from Ms. Johnson tied to any particular medical opinion, it's difficult to assess whether, much less conclude that, the ALJ erred in his treatment of it.

However, to the extent that Ms. Johnson attempted to rely upon Dr. Anderson's opinion, the ALJ adequately explained his reasons for rejecting it, as noted above. *See* 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."), (d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). And to the extent that Ms. Johnson attempted to rely on her childhood classification of "mentally retarded," that classification was not only stale—due to Ms. Johnson's deliberate attempts to prevent an accurate reassessment of it as an adult—but also wasn't made with reference to the Social Security Administration's particular definition of mental retardation for Step Three purposes. *See Mendez*, 439 F.3d at 362 ("It is something of a puzzle that the regulations require more than valid IQ test results to demonstrate mental retardation, but the explanation may lie in the fact we noted earlier that an IQ of 70, which

figures prominently in the criteria for disability based on mental retardation, is at the borderline between retardation and normal, if low, mental ability.").

The Court finds no error in the ALJ's decision to afford Dr. Modlik's opinion, reached after an examination of her, controlling weight, and to discount those from other sources.

### C. Step Five

As her final point of error, Ms. Johnson argues that the ALJ failed his obligation to include all of her impairments in his RFC determination, as is required under Social Security regulations, 20 C.F.R. § 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 416.920(c), 416.921, and 416.923, when we assess your residual functional capacity."). Specifically, she argues that the ALJ improperly failed to include as a limitation that she can only perform part-time work.

The Commissioner's response brief overlooked Ms. Johnson's argument about Step Five; he made no response to it.

Contrary to Ms. Johnson's position in her reply brief, however, the Commissioner's silence in the face of her argument about Step Five doesn't automatically entitle her to prevail on that argument, for two reasons. First, under principles of administrative law, the Court must focus on what the ALJ wrote—not what the Commissioner argues in a brief on appeal. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ. That is why the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion." (citations and quotation omitted)). Second, remanding for further proceedings on an issue that clearly won't result in a

benefits award for Ms. Johnson will just invite another, unsuccessful, appeal. To avoid wasting already scare judicial resources, the Court can overlook failings in argumentation. *See Neal v. Honeywell, Inc.*, 191 F.3d 827, 830 (7th Cir. 1999) ("Sometimes the judiciary must act in self-defense.").

The obvious reason why the ALJ failed to include a part-time limitation in Ms. Johnson's RFC is that he didn't believe that she suffered from such a limitation. The only justification Ms. Johnson cites for such a limitation is that she "ha[s] never been able to work on a full-time basis." [Dkt. 21 at 34.] But whether she has ever been able to find full-time work doesn't constitute the applicable inquiry here, which addresses only what work she can actually perform. *Jones v. Shalala*, 10 F.3d 522, 526 (7th Cir. 1993) ("If jobs exist which a claimant could perform, [s]he will not be entitled to disability benefits, regardless of the availability of those particular jobs to h[er]." (citation omitted)). Because Ms. Johnson has not provided a reason to believe that a part-time limitation was necessary, the ALJ had no obligation to include such a limitation in his RFC discussion. *Zatz v. Astrue*, 2009 U.S. App. LEXIS 21915, *11-12 (7th Cir. 2009) (per curiam) ("[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence.").

## CONCLUSION

"The standard for disability claims under the Social Security Act is stringent….Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Williams-Overstreet v. Astrue*, 2010 U.S. App. LEXIS 2604, *5 (7th Cir. 2010) (per curiam). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. Taken together, the Court can find no legal basis to overturn the Commissioner's decision that Ms. Johnson doesn't qualify for disability benefits;

therefore, the Court **AFFIRMS** the Commissioner's denial of her applications.  Final judgment will be entered accordingly.

   03/22/2010

                   _____
                   Jane Magnus-Stinson
                   United States Magistrate Judge
                   Southern District of Indiana

**Distribution via ECF only:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net